Case number 20-2013, Nita Gordon v. Keith Bierenga. All arguments not to exceed 15 minutes per side. Ms. Callie Mae Lester Henderson for the appellant. Good morning, Your Honor. May it please the Court, Callie Henderson on behalf of the appellant Keith Bierenga. Now, I would be happy to address... You reserve rebuttal time, I'm sorry. Yes, I'm sorry. Sorry. Thank you, Your Honor. Five minutes for rebuttal, please. Great. Go ahead. And I would be happy to address any questions this Court has regarding what was included in our brief, but I think it would be important to first address the two Supreme Court cases that were handed down on Monday as I think they provide guidance to this Court on issues raised in this matter. Those cases both were qualified immunity appeals by police officers. The Supreme Court handed down two rather short opinions addressing the qualified immunity analysis such that they decided both on the clearly established prong. Both of those cases, the Court reiterated the level of similarity and guidance that prior cases... or do you think they were merely suggesting that? I did read that suggestion into those opinions, Your Honor. I mean, there was a comment stating... questioning whether circuit precedent could provide guidance. If that were true, what would be the... So, would it be Graham and Garner? Would those be... What is the Supreme Court landscape from your perspective? I think if we're looking at the Supreme Court landscape, I don't think... Again, I don't know that they have essentially ruled out circuit precedent, but we would be looking at cases like Plumhoff. Plumhoff involved a chase and a shooting involving a vehicle. So the Supreme Court has provided some guidance on similar cases. I do think the circuit can still provide some guidance. I don't believe that has been wholly ruled out by the Supreme Court precedent. I do think it has been merely suggested. But under either the Sixth Circuit precedent or from the Supreme Court, I think these two new recent opinions highlight the argument we have raised here is that there was not guidance that would have informed Officer Barringa or every reasonable officer under the similar circumstances that his conduct was unconstitutional. Can I ask you... It was clear to me from the video that he was shooting from the side rather than the front, and so it's not necessarily clear to me that his life was endangered at the precise moment that he shot. So if we think that his life wasn't in danger, does that mean that there was a Fourth Amendment violation, or have you relied on the notion that others might have been in danger? I believe, Your Honor, is directing towards the fleeing felon rule, and I do believe that even if you find that his life wasn't in danger, you can still find that he did not commit a constitutional violation because Mr. Gordon had demonstrated multiple times his willingness to persist in his flight in a reckless manner such that he was endangering the lives of others in that immediate vicinity. You've debated quite a bit if there is an intent component versus just would reckless driving suffice to use a firearm versus whether if you needed an intent to cause somebody harm. Do you think that... I don't think there... If we take the facts in the light most favorable to the plaintiff in this case in watching the video, it just seemed to me that his intent was to escape and was not necessarily to harm anybody. So that suggests to me that you can only rely on this idea that just hideously reckless driving can be enough to allow for an officer to use a gun. Do you think... Are you relying on any kind of intent notions in the decedent, or are you relying only on the recklessness kind of idea? Your Honor, I think the intent question is an interesting component in that the officer is not required so much to prescribe any innocent intent and also in assessing the intent of the driver in that moment such that it's viewed from the perspective of an objectively reasonable officer. But I do think that the objective evidence of his reckless driving alone can constitute sufficient justification for the use of a firearm in that separating his intent from escape from that is that he intended to escape in any manner regardless of who was around. So I thought it was if an objective officer thought that there was imminent... An objective officer would think there was imminent danger to himself or bystanders, right? Yes. So you would look at it as the objective officer, whether he was being intentional, reckless, whatever it is, if he posed an imminent danger, that would justify the use of force. Is that right? Yes, Your Honor. You are correct on that. Okay. But where was the... So in some of the other cases, there are at least bystanders around. Does it matter that... I watched the video. There was one pedestrian walking as he fled after being shot, but there weren't a lot of people walking around at the moment that he used force. I think the analysis is not so focused on is there five people standing directly there, more so on the circumstances that the officer is aware of at that time such that he can assess that danger. And in this moment, we know that those circumstances included rush hour traffic, so not just pedestrian traffic. But he was in a small parking lot where there were vehicles in the parking lot. We know there were individuals inside the restaurant based on the witness testimony. We know that there were multiple individuals, at least five patrons inside the restaurant who could have left at any moment. There could be individuals that Officer Barringa was not able to fully account for at that moment, but based on just the circumstances at the time of day and the location. I think you're being pretty creative in trying to figure out why anybody else was in an immediate threat here. But more importantly, you started out by saying we need to look at the two Supreme Court cases for Monday. That's true. And they seem to say that you have to have a case that is sufficiently close in order to grant qualified immunity. And in this case, it seems like this case is almost entirely governed by Lattice. So why doesn't Lattice answer this? Lattice is talking about situations where immediate threats are much different than in this particular case, where somebody has led the police on a long chase and they shot at them and that kind of stuff. The only thing that happened here is this person sped away and cut across some traffic when he first went into the drive-in. And that's it as far as any sort of really immediate threat actions as I see it. So why is that wrong? Well, Your Honor, first I think it's important to recognize Lattice is quite literally night and day from the circumstances here, such that it doesn't present a factually similar circumstance that the Supreme Court has required. And there was more than just the cutting across traffic. From an objectively reasonable officer's perspective- Why is it night and day before you go down that road? In Lattice, the person was fleeing. That's true here. He was suspected only really of minor offenses. I would say that's also true. And I don't see where he posed any immediate threat, which is what Judge Murphy was asking. And if all of that is true, then you can't shoot somebody when you're standing beside the car. Well, I don't believe that is true, Your Honor. Lattice happened relatively in a very similar area. They're a few miles apart near Woodward Avenue. But the difference is Lattice happened at night. It was shortly after midnight. The opinion discusses how in the videos that were reviewed, there was almost no traffic. There was only one parked vehicle seen in any of those. And while we did have an actual pursuit, there were no pedestrians around. There was no one seen in the video. And that was a strong point of this court's analysis in there as to why there was no danger. There was no one in the immediate vicinity, not during the chase, not during the encounter at an empty parking lot. It was an empty state fairground is where that encounter, the shooting, had actually occurred. And the driver was actually in reverse when he was shooting. So these situations, when we look at what Officer Baringa was facing, quite different. It was a Tuesday afternoon, 6 o'clock, in a very heavily populated area. Lots of traffic, we know. We saw all of the traffic. The traffic, the heavy traffic, was one reason Mr. Gordon was actually able to flee without being seen. He was able to hide himself throughout that traffic. That's why Officer Baringa lost him. We know that there were pedestrians in the area. We were at a restaurant where there were customers. There were cars in that parking lot. There was a car immediately. I mean, Garner and Graham both clearly indicate that, generally speaking, you can't shoot a fleeing felon. And is the rule different? You can shoot a fleeing felon as long as the felon is fleeing in a car because the car is a deadly weapon? I would be troubled. I mean, I would conflict with that. So what's the immediacy of the harm that is required to allow for an officer to shoot just because of the fleeing? I think it is the demonstration of the driver's previous reckless conduct and disregard for the lives of the officer or anyone in that immediate vicinity, which we saw here when he drove directly into the location where Officer Baringa had been located. He reversed into the vehicle that was behind him, occupied by another pedestrian. Other vehicles, when he cut across traffic, as Judge McKeek referenced, had to brake for him. Those were the only reasons he hadn't caused harm prior to that is because other drivers had been cautious around him, such that Officer Baringa made the decision to prevent drivers from having to exercise that caution to escape in that moment. And I see that my time has expired. Okay, Counsel. Thank you. Thank you. Good morning, Your Honors. Kenneth Feingold appearing on behalf of the plaintiff, in this case a Pelley, Nita Gordon, on behalf of the estate of Antonino Gordon, deceased. So Ms. Henderson seems to say that you can shoot somebody when you're standing next to the car if you're trying to drive away in the car and there are any other cars in the area. And that seems to me that's sort of what it comes down to. So how do we address that? Well, that is what she's saying, and what she's saying is wrong. And we know that, not as a matter of, in my opinion, common sense, but by way of what the law is based on the lattice case in particular. We are fortunate to have the lattice case so sufficiently close in material facts that an objectively reasonable officer would have known that shooting a fleeing driver while standing next to that driver while that vehicle was attempting to flee would violate a clearly established right to be free from excessive force under the totality of circumstances when, by virtue of his proximity to the driver's side window, he was not, by that fact alone, in an immediate fear of his own safety. Can I ask you, so lattice is a good case for you, but the Supreme Court's case, and I don't know how to pronounce it, Brosseau, actually seems somewhat more analogous in that the officer shot at a driver and the officer was positioned there so the bullet went through the back driver's side window and into the plaintiff's back. That strikes me as like the car was farther away so the officer was in even less immediate danger and the court granted qualified immunity in that case because of the other people and the cars in the surrounding area. So why isn't, do you think, I would concede that that case did not talk about the Fourth Amendment and it was talking about clearly established and saying at the relevant time it wasn't clearly established. And so my question to you is, has that case effectively been superseded by later Fourth Amendment precedents or is it distinguishable? It's distinguishable and evolved, if you will. Why? Because I think the court stated in lattice, first of all, that it has been clearly established since 2007 based on Sigley and Cup that shooting a driver while next to the vehicle is a violation of clearly established rights under the Fourth Amendment. However, in lattice, but not in our case, qualified immunity was granted because in that case, similar to Brosseau, it was not clearly established that shooting a driver while standing next to the vehicle after a vehicle had engaged in arguably reckless driving, including an impact to a police vehicle, was a violation of clearly, of the Fourth Amendment. So that was unfortunate for the lattice plaintiff from my plaintiff's point of view. But it now becomes the clearly established law in the Sixth Circuit that shooting a driver while standing next to him, absent... What about the parking? I mean, I guess I go back to the parking lot. There could be people around. Why is it not reasonable or why wouldn't an objective officer think that there is imminent danger posed to... If you're a pedestrian or you don't see a kid in the parking lot or something, there would be a place where that would happen, right? As opposed to being out in an open field or out on the highway or wherever. Well, that's what happened in lattice, though. Well, no, in lattice... I've got a quote from lattice. Lattice's flight was on an effectively empty highway. He had shown no intention or willingness to drive recklessly through residential neighborhoods. Yes, I was about to say that. I was about to say that. But isn't that just simply fortuitous? Isn't that just... Couldn't there have been a hapless driver on Woodward Avenue or a pedestrian that just happened to be out there and was or could have been run over? Do you think the plaintiff in lattice said, oh, there's no one around. I think I'll go on a 65-mile-an-hour chase. But isn't... We may question the regime and maybe we all have questioned the regime at certain points. But those kinds of fine factual distinctions are what matter in clearly established law. The Supreme Court all but said that on Monday. We still are looking for these cases that are close, and we're cutting it thinly. But that's kind of where we are. Isn't that right? But the 800-pound gorilla is that a 60-mile-an-hour chase with or without people at noon or at midnight is still a 60-mile-an-hour police chase that did not occur in this case. There was no police chase. And that is a material distinction that matters. There was no police chase. He had been stopped by the police and had fled, right? Yes. So he's not interested in obeying the officer. And he was wrong. And he is not again interested in obeying the officer the second time. And he tries to get away, willing to ram his car. Maybe ram is a loaded term, I tell you. But hit another car in his haste to get away from the police. I mean, why at that point can't the objective officer say, Oh, my God, this guy is a danger. He's a danger to me because he might hit me. But yes, in that split second, he's at the side of the car and says, But he also could be a danger to somebody else in this parking lot, residential area, whatever it is. Well, it goes back to the Graham analysis. What are the factors that a reasonable officer should weigh? The gravity of the offense in the first place. And these are not all first among equals. The first among equals is the imminent threat to officer safety. There must be that. And that is lacking in our case. There was no immediate threat to officer safety. No, there was no immediate threat to officer safety or the public. That's true. That's true. Can I ask just a high – I'd slightly change the facts of this case. Yes. If when the officer pulled in, you know, he walked in, if he had seen people, like as he was getting out of his car and walking around, kind of meandering towards the White Castle entrance. Meaning who? The public. So just White Castle customers. If the officer had seen those customers walking towards the – when the decedent was coming out, would that be enough in your view to make the use of deadly force okay because of the risk that he might hit those people when fleeing around the corner? No. Not that fact in and of itself. Because, again, it's not what could have happened. It's what did happen. And I know defense takes – We're trying to set forth what is – this is a hard case. And I'm trying to figure out what the rules should be on balancing the value of life of criminal suspects versus the value of life of the public. Of course. And what matters is the objective evidence. And the objective evidence is that he was not using his vehicle as a battering ram, notwithstanding defense counsel's defense-favored view of the facts. I agree with you. So is that – is your view that if you're only driving recklessly, that it's not enough? The risk to the public is not enough? There has to be some – like you want to go after somebody? To use Judge McKeague's turn of phrase, hideously reckless driving. Yes, that would be the standard. Hideously reckless driving. Although that's not the legally operative word. That's the word that's being used today. Substantially reckless. There's always going to be some level of concern or danger, shall we say, to the public when someone is fleeing the police. If this officer had not shot my client, my client would likely be in jail right now for evading the police and bumping the police car and maybe endangering the public. He wouldn't be dead. He would only be dead if there was objective evidence that the officer was in an immediate fear of officer safety and that prior conduct was so reckless as to place the public in danger of an imminent threat, which simply is not existing in this case. He executed a three-point turn. They take exception with that, saying, well, that's ridiculous. There's nothing commonplace about this. But he wasn't using the car as a battering ram either. He did force the officer. Would you have thought the officer could have shot? Originally, when he hit the car, the officer was right in front and had to step to avoid the car. Do you think the officer could have shot through the windshield at the point where he hit the car? I think if he had done it at that point, it would have entered that hazy area of what would be clearly established and would likely inert to the defendant, excuse me, the officer's favor. But that's not what happened. Do you think that the officer could reasonably think, though, that he just almost hit me, so that shows what meets the hideously reckless standard? No, because of what the officer actually did in response. If he stood his ground or actually walked in front of that car and shot him to stop him from hitting myself or hitting someone who might be in danger, then yes, I would think that would be reckless conduct on the part of the officer, but that's not what would define the case. But he didn't do that. He didn't act as a hero. He acted as a coward. What do I mean by that? He walked up to the side of the car and he shot like a fish in a barrel. That's what he did from a position of safety. And then claims, but I was afraid. I was afraid that he was coming at me again. But that's not the objective evidence. He's entitled to that subjective belief. It's all a really good argument for a jury. It is. Thank you. And maybe you'll get to make that. I don't know. If we take the other side of Lattice, Lattice recognizes from Graham that we do have to give, we have to view the facts with due deference to the quick decisions officers have to make in tense, uncertain, and rapidly evolving situations. So as we've already talked about, Lattice is one where, yeah, there was a chase, so you could say, well, that sounds like that's worse conduct. But then the court says, yeah, but it was out in the country and he really never put anybody in danger. Here, this police officer has just seen him put people in danger by pulling in front of oncoming traffic in a quick, evasive move. There's no argument about that, right? There's no argument that that's what he did. He made an abrupt turn in front of traffic. And while he's still in this drive-through window, it's a restaurant on a very busy street at rush hour, right? Right. So taking it now from the other side, then why wouldn't it be reasonable for him to believe that he's going to do what he had just done 20 minutes earlier and that that absolutely would put people driving down the street that he has to use to get away in immediate danger? Because what he did 20 minutes earlier was make a harebrained left turn in front of traffic. And that's a misdemeanor. Let's assume he's going to make a harebrained right turn in front of traffic when he's trying to escape the officer. Because now he knows that he's really in the soup, right? Because the officers found him and pulled in to block him off. Well, okay. I mean, again, what did a reasonable officer know? He knew that he committed a misdemeanor. Had he made contact, had he T-boned someone on that left turn, hey, all bets are off then. All bets are off. Now he is on this rampage to do anything away from the police. But that's not what happened. In fact, you can look at the rest of the video. After being shot, he is still fleeing because it took another two, three minutes, if you will, for him to actually bleed out and die. And what happens? He's driving along 13 Mile Road. There's nobody there. There is nobody in harm's way. That's where the pedestrian was. I was actually looking to see if there was any pedestrians around, and there was within 15 feet of him turning right from the White Castle on to, I don't know what street it was. It would be 13 Mile Road. Okay. When you look at the video, he had probably passed by 15 feet. But there was at least one person walking. And then when he turns right, he kind of loops far out, and so another car had to stop. Well, and when he turned left abruptly in the first place, there were cars coming. They didn't descend from the heavens. They were there. And there may have been a pedestrian there. But interestingly, even after being shot, he didn't hit a pedestrian. Maybe he was being very careful not to hit a pedestrian because that's not what he wanted to do. He wanted to get away. So we can't just project these what-ifs on what might have happened. We only know what did happen. And what did happen was the level of crime that he was committing was very low level. It was not a violent crime, unlike all the other cases. Unlike Lattice, at least in terms of the police chase, in terms of Plouhoff and Mullinex, those are game changers. Of course there was qualified immunity when you engage in a 90-mile-an-hour police chase. In the most recent case with the Supreme Court, forget the name of it, but he had a hammer in his hand. He had a hammer. The police said, I thought he was going to throw it at me. There was nothing of that nature in this case. Our problem here is that qualified immunity develops incrementally. True. And now that we don't have to address the constitutional violation first, it's probably even more incremental, right? So here we have a case where the Supreme Court is very clear on Monday that we have to find a case that tells the police officers they can't do what they did. So now we're trying to figure out whether Lattice is that case. But Lattice seems to be distinguishable in terms of what the officer knew that that person there had done, or didn't do, so therefore there wasn't risk to the public. Here this guy had done something. We may say, well, it's not bad enough, but how do we resolve this conflict between Lattice and the Supreme Court telling us, it's got to be a pretty darn specific case? Well, with all due respect, I would say that we do have a pretty darn specific case, and it is Lattice. There's always going to be a difference. There's always going to be some differences. The question is, are they substantially the same in all important material respects? And I would say that the conduct in Lattice was even more egregious than the conduct in our case. An objectively reasonable officer would have known that after Lattice, you cannot shoot someone standing next to a vehicle who has turned left in front of traffic, who has cut off traffic before, minor traffic offenses, and has bumped the vehicle behind and bumped the vehicle in front. And I say bumped. There is a pending motion before the court, hasn't been resolved, to supplement the record with the photographs. The photographs speak loudly here. A picture's worth a thousand words. There's no damage to the police vehicle. He bumped it. If he was intent on committing to hurting that officer, you would have seen him ramrod that vehicle, and the vehicle would have been disabled on the spot. Not the facts in this case. And for that reason, I would ask that this court uphold the lower court and deny the appeal. Thank you very much. Photo. Your Honor, I would like to address two points on rebuttal. In regards to what I just heard from Brother Counsel, such that what he is proposing violates the Supreme Court's instructions on how we perform the objectively reasonable officer analysis, such that we don't look at this in hindsight.  when he was forced to make that decision. There was a lot of discussion as to what happened afterwards. After Mr. Gordon drove off and he did escape again, as to whether he was successfully navigating throughout the White Castle parking lot and avoided any pedestrians or anyone else in the area. Officer Baringa didn't have that luxury at that time. All that he knew at that time was what he had witnessed and the conduct he had witnessed for Mr. Gordon was cutting across traffic, making other people stop for him. He drove the wrong way through the exit of the White Castle, which I don't think can be discounted. Such that his perspective was that this individual was intent on fleeing, no matter who was in his path, whether it was an officer standing directly in front of him, whether it was someone sitting in the car behind him, which he did strike. So he struck two vehicles in his pursuit to escape. Such that to look at, well, he did it successfully. He did escape successfully. That is not information that Officer Baringa had and that he could rely on at that time when he was making that decision. I'd also like to touch on... I assume it's the totality of the circumstances would be your argument, not any reckless driving. If an officer just sees somebody make a reckless left turn, that doesn't give the officer the right to shoot at the car. Certainly, Your Honor. That is correct. So it has to be... If you were to count up all the circumstances why the shot was reasonable, what would all those circumstances be? I would go all the way back to the original reason for the stop. I think that's where it began for Officer Baringa. He witnessed him pull out into traffic, violating traffic laws. He turned into the middle lane. He cut off the first vehicle. That's why Officer Baringa tried to stop him in the first place. He didn't stop. Officer Baringa activated his sirens. He didn't stop. We're missing something, too, that we haven't talked about before. Didn't the police officer observe what he thought was a certain condition this guy was in when he went up to the window? Yes, Your Honor. He did. Officer Baringa believed that Mr. Gordon was under the influence of something because he observed him to be pale, sweating, and had glassy eyes. Now, you say that's corroborated by the video from the drive-in. I just have to tell you, I've looked at that. I don't think you can tell that at all. But there's nothing that rebuts this. As a matter of fact, it was sort of coincidentally confirmed after he dies by virtuous blood of alcohol content, right? Well, Your Honor, I don't think we argued that it was corroborated by what you can see in the drive-thru video. I think the district court discounted Officer Baringa's account based on the drive-thru video, and I would say she was incorrect in doing so. I'm just telling you, ignore that for just a second. So the officer thinks, correctly or incorrectly, this guy's under the influence, right? Yes, Your Honor. So what do we do with that in terms of a factor that either distinguishes us from Lattice or doesn't that goes to the question of whether he poses an unreasonable risk to others when he speeds away? Your Honor, I think that adds to our argument that he was posing an unreasonable risk such that it was giving Officer Baringa more insight into how reckless he actually was under those circumstances, and that is what an objectively reasonable officer would have seen, would have been using that as part of the... Are we getting into a fact question, though? I know that the video, I just couldn't tell. But then some of the other witnesses at the White Castle suggested that he seemed normal or did not seem under the influence. Is there a dispute of fact that we have to construe against you at this stage on this point, or can the fact that the officer just thought this and it was later confirmed by the autopsy report allow us to credit his account? Well, I don't believe that what the witnesses observed, just 13, I think actually was the official time, 13 minutes later, can detract from what Officer Baringa did observe while he was conducting the initial traffic stop, such that that can create... But isn't the question whether the officer just gave a pretextual reason here and that he didn't really observe it, and couldn't the fact that the others didn't observe it create a dispute of fact about whether he, in fact, did? To the extent that the court would find that that would be a dispute of fact, I don't think the materiality of that dispute detracts at all from the totality analysis that Officer Baringa was conducting at that time, and whether that... I don't believe that changes the justification for his use of force at the time either. I see that my time has expired, unless the panel has any further questions. Thank you, Your Honors.